The next case on the calendar is Umami v. Cervax. Good morning, and I understand that we are starting with the Umami breach of contract appeal, correct? Yes, Your Honor. Before I start, there are two appeals in the first argument because Umami is appealing from the trial rulings, and Monor is appealing from one of the trial rulings and for the refusal to allow them to do, to add a UCC claim. So the first appeal will cover both our appeal and some portion of their cross appeals. And then Cervax's appeal will go, will follow, and that's going to be on the tortious interference claim. So we're confused, too. It took us a while to sort it all out. Well, I think if we push the tortious interference in the second argument, it will be. And that's the way we did it, you know, so the trial issues and Umami-Monor go first, and then we'll deal with tortious interference separately. Please proceed. Okay, thank you. May it please the Court, Martin Siegel representing Umami Sustainable Seafood, Inc. After trial, the district court awarded Monor damages of $2.5 million plus prejudged interest of $840,000. The largest portion of the damages was $1.55 million for what's been called the interest differential, that is, the difference between interest calculated under the credit agreement by Ms. Galbraith of WBC and the amount that the Mexican court issued under the promissory note in 2016. Under Clause 20B of the mortgages, Monor had a right to pay, quote, the total obligations, close quote, under the credit agreement, the promissory note, and under this mortgage. So there were three requirements for total obligations. That is the provision that the district court found was breached when WBC failed to tell Monor what its total obligations were. There's no dispute that Ms. Galbraith calculated interest only under Section 2.2 of the credit agreement and not under the promissory note. Her calculation was for internal use. In fact, it's dated November 1 or 2, days before there was even a demand for a payoff number. And, most importantly, that calculation was not reviewed by their counsel or by Umami, who's now responsible for it. They might have known or would have known that, in fact, the number she was using was not the total obligations under the three agreements. Ms. Galbraith simply did not calculate Monor's total obligations as she would have had to do if she prepared a payoff number. In February 6, 2013, Mr. Abizaid, the outside counsel for WBC and Umami, in the foreclosure proceeding, gave Monor a payoff number calculated under the promissory note. The terms of the promissory note on acceleration and default interest, particularly, were significantly different than those of the credit agreement, and I refer you to SPA 104 paragraph 16, where the court describes those differences. Another way of describing the differences is to look at paragraph 130 of the district court's opinion. It's SPA 143, where the court compared the two calculations. What's very interesting is in that paragraph . . . I'm going to interrupt for a second. You said that they were given a payoff number, the higher payoff number, the 7.9? That's what we say. Yes, Your Honor. And that was February 6? February 6, 2013. Ironically, the judge in that paragraph cited NML Capital, New York Court of Appeals case, for the proposition that acceleration of interest is determined, quote, by the language chosen by the parties in the pertinent loan agreement, close quote. Yet in deciding that Umami breached the mortgages, the district court used Ms. Galbraith's credit agreement only instead of determining mortgages' total obligations under the three agreements, and thereby ignoring the very case she cited that you determine these things by the language chosen by the parties in the pertinent agreements. When the Mexican court finally got around to determining interest, they used virtually the same formula and virtually the same numbers, obviously dragged out a little further because it was two years later. It followed the same methodology used by Mr. Abizaid in that February 6 number, and the same methodology used by Marner in a liquidation motion, I'm sorry, Umami made a liquidation motion that same month. And when the district, I'm sorry, when the Mexican court finally got around to doing it, guess what? It used the same formulation under the promissory note, not under the credit agreement. Now the district court basically said, I don't care what the Mexican court did. That was inaccurate. They shouldn't have followed Abizaid's calculations. I'm just going to ignore it. And we've submitted, I don't think I need to go through the cases, that that violated the international rules of comedy. She should have followed the Mexican court's ruling. Now what's interesting is there's an argument of, well, how did she interfere with the proceedings? We submit that if the Mexican court said, Umami's entitled to $1.5 million, and then the district court here says, no, I don't like that, Umami, you give the $1.55 million to Marner, that's interfering in saying we're going to ignore what the Mexican court did. The district court here is not casting any aspersion on the Mexican court proceedings. The district court here made factual findings that there was a breach of contract because your client didn't give a payoff number in November and then gave a payoff number in February, but essentially reneged on the payoff number it provided, and that the damages, some of which arose in the Mexican proceeding, flowed naturally from those two breaches. So it's not recalculating the Mexican court's calculation of interest. It's just calculating the damages that happened to arise in the context of a litigation in Mexico. But it is undoing the Mexican court's determination of what the correct amount of interest is. Just follow this. Yes. Paying 6.01 was the wrong number. Ms. Galbraith calculated it for a different purpose, but that was not the total obligation. What the district court said is, you should have paid the wrong number, and I'm going to ignore the correct calculation, in our view, by the Mexican court. So go pay the wrong number, not the correct number. The correct number was the number determined under the promissory note. And what the district court said, I'm going to undo, you know, disregard what the Mexican court did. We say that they couldn't do that, whether it's comedy or anything else. The correct number was 7.9 includes attorney's fees, but the correct number is the principal amount plus the interest as determined under the promissory note as found by the Mexican court. So we think that, and one other thing, the district court erroneously, erroneously said in SPA 164 paragraph 9, that she's awarding this as the difference represents the amount quote, your mommy ultimately recovered in Mexico, close quote. That's just not true. While there may have been an award of that amount, your mommy didn't recover anything. So the situation you have now is there's 1.1 million still of that amount outstanding. So you have your mommy giving mon or money that it never paid as a result of the Mexican ruling. We think that that is wrong. Just very briefly, since I see my lights on, and you'll be arguing again, and I'll be arguing again on a different point. So why don't you just give us your last pre-judgment interest. She awarded pre-judgment interest before the damages for the interest differential even occurred two years earlier. And on monies that they never paid, out of the 5 point, I'm sorry, the 2.5 million, on December, as of December, they didn't pay the interest differential, they didn't pay the customs fee, and they only had paid 64,000 of the attorney's fees. And lastly, a week ago, we sent you- Right. That doesn't exist anymore. We think you- Let's address that. You can address that in rebuttal. Thank you very much. Good morning, your honors, and may it please the court. Ilan Rosenberg on behalf of Cervax, as now the Yassini of Marnor, in this case. I'd like to address, first and foremost, the fact that I know the court is well aware of Chief Judge McMahon's very, very detailed findings of fact and conclusions of law. We spent a long time litigating this case, and we presented, and by we, I mean Marnor, presented a lot of witnesses to the judge in this bench trial. In fact, we brought up all of the relevant witnesses, some of whom are here today as well. The judge, after a bench trial, issued very extensive, very detailed, and very concrete findings of fact. And the fact of the matter, too, is that Umami doesn't like those facts. That's why it refers to the court's findings of fact as allegations throughout their briefing in this court. But they're not allegations. They're facts. They're proven facts in the court. Umami takes issue with whether or not WBC actually provided a payoff number when it gave the 6.01 million figure. The question that was being answered, the question posed by Umami CEO Tim Fitzpatrick to Leslie Galbraith is, what is the total amount that Philippe, Mr. Sherrod, Marnor has to pay to pay off the entire debt today? That was November 2nd of 2012. And Ms. Galbraith, with a very detailed accounting, Ms. Galbraith, who had managed this account from the inception, with the contract that they had drafted with a relationship that was theirs, following OPEC's model, said $6.01 million. Ten days later, they decided that they weren't going to share with us that same information, despite our exercise of our right to cure. Under the mortgages, under the credit agreement, they were not going to share that information with us. And that is what triggered this whole problem. The court made very detailed findings concerning our inability to satisfy this debt and redeem our fleet without the assistance of WBC and Umami. And as the court said, apparently reconsidering what she had viewed as implausible or somewhat implausible claims on our part, WBC inexplicably and inexcusably decided to follow Umami to try to take away our fleet. And they succeeded. There is no such thing as a fake payoff number. There is no such thing as a mistake. On November 2nd and on November 12th, WBC was the lender of record. They owned this account. They knew how much was owed. And Umami, as their assignee, takes the exact same rights and subject to the exact same equities as WBC. That is what the court found. And that is what the court concluded as a matter of law and substantiated with plenty of New York authority. Frankly, I'm also a little baffled by the notion that Mr. Siegel tells us now that Umami didn't recover anything. We only need to look at page 16 of his brief. They recovered vessels worth $6.5 million. That's a half a million dollars more than what was already owed, yet continued to prosecute that case to the tune of $2 million in interest plus attorney's fees and costs. And I don't even want to get into that because I think Judge McMahon did a good job at disposing of that issue. Can I ask about the customs fee? Yes. Your adversary says, as it turns out, the Mexican courts are not going to assess that fee. You're not going to have to pay it. So that should not properly be part of this damage calculation. That's incorrect, Judge Livingston. What has happened is that the tax authority's assessment of the customs fee has been revoked, which means that the penalties that the government imposed have been revoked. The customs are due on those ships. The duties must be paid on those ships because they were imported temporarily and have now become permanent residents of Mexico. And frankly, UMAMI is the beneficiary because they have never been assessed those fees because the tax authorities now deem those boats permanently imported at the expense of Marnor. So you're saying that there is no portion of Judge McMahon's calculations that has been undone in Mexico? I'm not saying that at all. In fact, I conferred with counsel upon learning about this, and we definitely believe that there's a Rule 60 issue that needs to be addressed with Judge McMahon, and we will be happy to do so. We don't want stuff we're not entitled to, but we certainly want everything that we are entitled to. I think on the remaining issues, I had just one brief— Could you please address the basic comedy question? Absolutely. Judge McMahon's order relies on the Mexican court, the differential between her calculation, the 6.1, and the 7.9 that the Mexican court found. Why isn't it directly in contravention of the Mexican court's calculation and finding for her to award this differential, which, as Judge Livingston has pointed out, can vary depending upon other subsequent actions by Mexican authorities? Well, Umami has obtained a judgment in Mexico. Umami has a judgment that's perfectly valid. Judge McMahon has committed no harm and no injury to that judgment. What Judge McMahon has said is the following. On November 12th, which is the date that she found the breach to have occurred, they owed $6.01 million. Any additional amounts that Umami tries to recover is damages. That's the differential. The Mexican court has ruled there's no violence perpetrated on the Mexican judgment. That judgment is perfectly valid, and Umami has every right to go and enforce that judgment against Mar-a-Nor in any way that it sees fit. There is no violence done to that judgment. It seems that the more the Mexican court gives to Umami, the more it's— Absolutely. —taken back with the other. Absolutely. And that's exactly why, when a party breaches a contract, it can't come into court and complain that it's having to pay the price for breaching that contract. Was the breach litigated in the Mexican courts? Was the obligation to provide a payoff figure and to allow a repayment extrajudicially litigated in the Mexican proceedings? It was not because the breach—the first quote, and I'll call it a payoff number for purposes of just this statement, was not provided until after the Mexican court had already issued a final judgment on the core proceedings. The rest of the information is information that we learned in the course of litigation in the Southern District of New York. None of that information was disclosed in Mexico. There is no discovery in Mexico, and there was nothing available for Mar-a-Nor to fight with in the Mexican proceedings until we initiated— In terms of the term of the contract still provided that you were entitled to pay off ahead of time. But there's no amendment to pleadings in Mexico either. So once we answered the complaint, that fixed what was up before the federal court in Mexico, before the foreclosure court in Mexico. So we could not make an amendment to our defenses at that point in time. Moreover, we also didn't understand why nothing was forthcoming from them. But that's a separate question, and that's a question of fact that the court has already ruled on below. But there are no amendments to the pleadings, so we could not do that in Mexico at the time. Now if I may, I know I have only two minutes, but there's only two issues that Mar-a-Nor itself is appealing on its own. The first is the UCC piece, the reinstatement of a UCC claim, the Article 9 claim. UCC Article 9 provides that a secured creditor is obligated to provide a payoff number upon demand by a debtor. There's no question all the relevant facts have been found to support a finding of liability under UCC Article 9, and that would entitle the secured debtor or the debtor to any damages or any loss. What establishes that the New York law and the UCC applies to this Mexican transaction? I think the issues are twofold. Number one, the mortgages themselves do not create a debtor-creditor relationship. They're pure security for the debtor-creditor relationship that arises under the credit agreement and perhaps the note, both of which are New York documents, both of which are New York contracts, number one. And number two, both WBC and UMAMI at the trial court during closing arguments specifically said that this entire body of documents from the credit agreement to the mortgages to the quote-unquote one transaction, UNO was the word they used. That was WBC, and that's A1712. UMAMI echoed and adopted every single thing that WBC articulated. That is A1777. I have 20 seconds left. As far as the insurance premiums, we rest for the most part on our arguments in the final point, which is that the existence of the duty to buy insurance by UMAMI was contemplated by UMAMI. You can find that at, it was PX198, which is A2013. That was a miscite on our part in our briefs. But it was certainly contemplated and it's also reflected in the body of Judge McMahon's opinion because it's contained as an obligation of UMAMI in the option contract, in the option agreement. Can I ask one more question, please? Yes. Am I right in understanding that even today the Mexican court's interest award is not yet final? And if that's so, how can we affirm an award of a judgment that's tied to an award that is variable? I know this is not in the record, but UMAMI has represented to the district court that the judgment on, that the award is final, that it is now final. Okay. Thank you. It was not final at the time the judge entered the decision. But it is final now. It is final now. Just two things on the, well, three things. On the insurance point, the insurance was required to be contained, required to be maintained under the mortgage. And so it wasn't what UMAMI did. And secondly, we pointed out that the insurance claim was already included as part of their claim for lost profits. If you look at their findings of fact, somewhere I lost my note, their proposed findings of fact when they included their lost profit calculation, they included the same insurance payment. So the courts already ruled that was before the court, and the court rejected their lost profit calculation that obviously included the insurance that they already sought. On the UCC, you can't use a post-trial finding to determine whether the judge was right. He cites something that was set at trial. You can't use that to determine whether the judge was right to find that these are separate agreements and to prove that they're separate agreements. It's the mortgages that creates the security agreement. The mortgages are governed by Mexican law, and therefore the UCC, not New York law, and if you look at A2119 and the 2221 in the record, it's the credit agreement, and it lists loan documents, credit agreement, security documents, mortgages. So the very documents that they're citing prove that the security interest arises under the mortgage and the mortgage only. And just three very brief points on his response. One, they may not have been able to amend their pleadings, but we sent them what we thought was a payoff number in February, and then made a motion to liquidate interest. The number that they say they didn't get, we couldn't possibly figure out, we made a motion to liquidate interest. It didn't get decided at that point, but the judge ruled, and this goes into causation and mitigation, that at any time, they could have made a motion to liquidate interest as well, and it would have been decided in four or five months. Now, she excused it because they rationally were trying to negotiate, but we think the failure to make a motion to get the very information they say we deprive them of, that would have been decided in four or five months, has to be- They alleged that they had a contractual right to pay off and to get a payoff number outside of the court, and there are reasons one might choose to exercise that right. Do you disagree that they had a contractual right to the number? The judge ruled that they did, so I'm accepting that ruling, but that's a different issue as to just because you had that right doesn't mean you cannot make a motion available to you that would have reduced your damages and gotten your fleet back by making a liquidation motion. In Mexico, though, the judge also found that causation is no other intervening cause. I'm sorry, no other cause exists. It's sort of like our intervening cause. If you had the right to make a motion and you didn't avail yourself and you didn't tender, you know, those are other causes of your damages that have to be taken into account, and the judge just ignored them because she said, oh, they ruled rational. It doesn't excuse your other obligations. Just one last thing on the calculation. The fact that Ms. Galbraith prepared it one way does not waive their rights to come up with the right calculation. The credit agreement, all the agreements contain no waiver clauses. And, in fact, one of the things that's cited is that letter from their lawyer left blanks. It says, you know, he didn't send it. We acknowledge that. But if they had to figure out what those numbers are and fill in the blanks, we submit that they would have filled in the blanks exactly as you mommy calculate them. And by February they had those numbers. Thank you. Thank you. Let's move on to the cross appeal. We have new counsel judges. Your Honor, we won't hold them to the role of appellants if they sit on that side. I don't think you have to switch sides. Well, just so you know, Your Honor, we are appellees, so we'll sit with the folks over here. Good morning, and may it please the Court, Your Honor. Jacob Cohn for the plaintiff. I think it's easier just to call plaintiffs and defendants because when we get into the appellants and cross appellants it gets very confusing, which is now Cervax. And Cervax is the assinee of Marnor. In the court's, the district court's findings, she dropped a footnote, footnote eight, where she said it is indeed unfortunate that Mexican law does not recognize a cause of action for tortious interference because she found at least with respect to Umami's interference with the WBC contractual relationship it would rise to the level of tortious interference. My goal today, hopefully, is to convince the three of you that Judge McMahon doesn't have to feel so bad because she committed legal error, and she committed two legal errors, the first of which was to determine that there is no recognizable cause of action for tortious interference under Mexican law. And the second of which is that even if she was right on the first one, her application of Mexican law under the facts as alleged in the proposed amended complaint is inconsistent with New York law, especially as the court expressed twice and emphatically the second time in Leachy. So if I could walk through the analysis, of course, under Curley. If there is no conflict, you apply the law of the forum. You just start at the very, very beginning to make sure that I'm clear on what the allegations are about who interfered with what contract. Okay, we are looking to get three counts of our proposed amended complaint back. Count five, count six, and count seven. Count five is, at this point, Cervax versus Umami for interfering with and frustrating the joint venture between Cervax and Marnor, the contractual joint venture relationship. Count six is a bit of a hybrid at this point. And it's also Cervax and Marnor versus Umami and Amera and its principal, Mr. Tashian, for frustrating the joint venture and for conspiring with Umami to commit what the conspirators referred to as black ops to interfere with the ability of the joint venture to fish. And count seven is Marnor versus Umami for the interference with the contractual relationship with WBC prior to the assignment of the debt, which is the one that the court in footnote eight, the district court found is factually proven. Okay, so I have two questions for you. With regard to five and six, Cervax versus Umami and Marnor versus Umami, Cervax didn't exist except pursuant to the joint venture agreement. Altex and Marnor were parties to the letter of intent. To be clear . . . Is that correct? The letter of intent resulted in the formation of Cervax, and we can debate whether the court was right by finding that in the summary judgment ruling in Amera's favor that it was September of 2012. But in all events, it was prior to November of 2012 when the contractual breach occurred. Wait a second. I'm confused because I don't understand how Cervax, which was created by the joint venture agreement, can claim to have Umami have interfered in the joint venture agreement. Cervax . . . You have two other parties to the agreement. Cervax didn't even exist except for the joint venture agreement. Cervax comes into being. It is contemplated in June to be created. It is certainly in existence by September. It is the vessel, if you will, through which the joint venture is to proceed. And the contract between Cervax and Marnor is Marnor is going to contribute . . . There is no contract between Cervax and Marnor. There's a contract, a letter of intent, between Altex and Marnor. Correct? To which Cervax succeeded upon its incorporation. Well, how do we . . . What document reflects that? Cervax is the creation, the product of the letter of intent. Well, in the trial record, we never got to that point. In the summary judgment record, there are affidavits that I don't have the citations handy by which we put in the evidence that said that Cervax . . . I'm sorry, Altex is the promoter, and Cervax is created, and Altex contributes its contracts to Cervax. And that's the way a lot of things are created in the corporate world. You have a promoter. You then form the corporation. The corporation ratifies and accepts those contracts. So that's the standing issue there. The court granted summary judgment for Amera on the breach of contract, which is not being appealed because the breach of contract that we alleged was breached, she said was a contract that was in June prior to the formation in September of 2012, according to Judge McMahon, of the . . . of Cervax. So she said you don't have standing Altex . . . I'm sorry, Cervax . . . to litigate Altex's June 2012 confidentiality contract. So separating those out, we're not talking about that. We're talking about a contractual relation that begins to be interfered with in November of 2012. It begins to, but the breach occurs in November of 2012. And the contract in each case is what contract? Okay. Well, as to Marnor, it includes the contract with WBC that Umami interfered with. As to the other claims, it is the arrangement between Marnor and Cervax, including the Altex agreement to which Cervax . . . And where is that reflected? Is there a written contract between Cervax and Marnor? There is the testimony at trial about how all of this came to pass. There is the letter of . . . I'm sorry, the letter of intent that documents some of it, all of which the testimony is the record. There's no trial on this yet. But the summary judgment record is it was all assumed by Cervax upon its formation. So . . . But again, only Altex was the party to that contract. Altex was the original party to the contract. So as to counts five and six, it's the letter of intent. It's letter of intent and testimony and the actual efforts to . . . Testimony created a contract? No, the testimony that an oral contract existed. If you look at the . . . Oral contract. Well, it was not fully documented in writing. Mr. Serviget issued a $2 million check on a handshake, okay? And there was an agreement, and it was going to be funded, and it carried forward. That is all very clearly in the findings of the court. So I realize my time is drawing short, but I really came . . . Let me address the choice of law. I really came to talk about spectrocyte and animal science, which is the new Supreme Court decision that clarifies and gives some guidance as to how courts should go about choice of law analyses. But spectrocyte is a very important 2011 Mexican Federal Court of Appeals decision that resulted in forty-nine discrete precedents being published by the Mexican Judiciary Council. As resulting from it, it is something that we have been able to translate the central holdings of, and that court says, we recognize that Mexican law on tortious interference is the same as Delaware law, which is the same as New York law. And that is . . . Didn't they say that in the context of a case where one party . . . There's a party that controlled one of the parties to the contract, and it seemed to me, and I'm reading it in translation, but to be as much about veil-piercing as about tortious interference with the contract. It was a veil-piercing case, it was a choice of law case, and it was a tortious interference case. And this is the only statements from a Mexican tribunal that anybody has found, and it's from an intermediate federal court of appeals, in a very respected decision that has a result . . . I am told that thirty-nine precedents being pulled from a case such as this is highly unusual. So, but, I mean, beyond that, even if you don't buy that Mexican law now recognizes it, which Judge Kerr sat on that panel, is very clear. When you have tortious conduct resulting in harm, and the tort and the harm happen in different places, almost always you apply the substantive law of the place where the liability-producing conduct occurs. And I'll just ask one . . . Your time's expired, but I'll just ask one question, because I . . . There are always exceptions to the general rule, so why isn't this one of them? In the sense that in Lychee, all the challenged conduct, tortious conduct, occurred in New York. Here, a lot of it took place in Mexico. Well, our allegations and our complaint is that the conduct for which we are seeking to hold Amara and Mr. Statian viable, by and large, overwhelmingly took place in New York in the context of contracts that almost all of them were governed by New York. The credit agreement was governed by New York. Their agreements with Umami were governed by New York law. This thing is steeped in New York law. So, when you look at it, and I'll tell you why I say Lychee II is emphatic, because if you look at it, there's a First Department case called El Malayik versus the Bank of China that the panel in Lychee, while a different issue was pending further consideration, took a look and they brought this to them and said, Look, the state of New York is applying Israeli law to this Bank of China. You should follow it. And that panel, per curiam, said, No. The First Department got it wrong. This is perfectly well settled under the Court of Appeals precedent. They didn't even consider sending it and certifying it to the Court of Appeals. This is wrong. This is the law. And I think that we submit that Lychee controls that decision here. Thank you. Good morning, and may it please the Court. I'm Melissa Colon-Basilet of Sidley Austin. On behalf of defendants, Cross Appellees, AmeriCapital Management, and Craig Tashian, who I'll refer to collectively as the Ameri-Defendants. Despite the numerous parties and appeals here in this case before you, the posture as to the Ameri-Defendants is straightforward. All claims were dismissed as to the Ameri-Defendants, and as to the claim for tortious interference specifically, the district court properly rejected it not once, but twice. This appeal provides no viable ground to reinstate the tortious interference claim, a claim that plaintiffs have waived in multiple ways under New York law, and a claim that does not exist under Mexican law. We ask that the court affirm the district court's dismissal. Plaintiffs primarily argue that New York law governs. What they ignore is that the district court dismissed the claim under New York law as well. Their opening brief did not challenge the basis for that ruling, and they offered no argument that the Ameri-Defendants were the but-for cause of the alleged harm. Indeed, they did not do so for good reason. They already conceded the point below by failing to respond to it in Ameri-Defendants' motion to dismiss. Then, seven months later, in what the district court aptly described as an attempted end run around the decision, plaintiffs filed an untimely motion for leave to amend, and again failed in their opening brief to address how the proposed amended complaint addressed the but-for defect. In reply, plaintiffs remarkably suggest that the but-for argument is somehow new. It is not. Having failed to address the causation argument below, and again here in their opening brief, they should be foreclosed for doing so now. Even if there is no waiver, the proposed amended complaint does not allege that the Ameri-Defendants were the but-for cause of plaintiffs' harm. To the contrary, it alleges Imami to have been on a predetermined course to destroy its competitor, Maranor, by obtaining the note from WBC, getting access to the vessels, and then not providing plaintiffs with a payoff number. Accepting those allegations is true, which we must for purposes of this motion that was before the district court. Ameri-Tajian could not have been the but-for cause. While plaintiffs are focused and have argued that New York law applies, let me address some of the arguments that relate to Mexican law that the panel seems interested in. Mexican law does not save plaintiffs' claim either. As detailed in our brief, the parties filed extensive submissions on the question of whether Mexican law recognizes a claim for tortious interference with contract. First, in connection with the defendant's motion to dismiss, and then again in plaintiff's motion for leave to amend. Each time, the district court properly concluded that Mexican law does not recognize a claim for tortious interference with contract. Plaintiffs contend that the district court's interpretation of spectrocyte was patently in error. It was not. But even if plaintiffs' interpretation about spectrocyte were correct, it wouldn't matter, because it is undisputed that spectrocyte does not constitute jurisprudencia under Mexican law and is therefore not binding. Ironically, plaintiffs criticized the district court below for relying on this court's 2016 decision in Desarrolladora Farron, which held that Mexican law does not recognize a claim for tortious interference with contract, but asked this court to accept as binding and controlling here a case from a foreign jurisdiction that under the foreign jurisdiction itself would be deemed not binding. Our decision was a summary order, correct? It was. It was. It's just pointing out the kind of doubleness of the argument here on plaintiffs that the district court erred in doing it there, but this court should do so here with a non-binding decision in a foreign jurisdiction. Since spectrocyte is not binding, plaintiffs pivot in their reply to animal science in an attempt to kind of bolster the relevancy and controlling nature of spectrocyte, but nothing in animal science suggests that the court must take spectrocyte as controlling here. Here, plaintiffs proffered interpretation of a non-binding Mexican decision, an interpretation that is contrary to the jurisprudence from several U.S. circuit courts, treatises on Mexican law, prior expert testimonies and affidavits that were submitted by plaintiffs' own expert, and several expert submissions by defendants' Mexican law expert that simply spectrocyte is not dispositive. In any event, even if it were binding, plaintiffs' extensive quoting of the passages still fails to rebut the district court's decision. First, spectrocyte does not make any broad pronouncement about tortious interference with contract. As Your Honor recognized and Mr. Zamora, defendant's Mexican law expert below, explained, the key finding of the spectrocyte case was that the foreign parent's control of the subsidiary could result in the direct extra-contractual liability of the parent through the doctrines of alter ego and piercing the corporate veil. Spectrocyte does not stand for the proposition that Mexican law recognizes a claim for tortious interference with contract generally. In response, plaintiffs contend that spectrocyte also found an alternative that the holding would be equally relevant under Mexican law. However, our expert below explained and district court seemingly found persuasive that that passage was only dicta. Finally, I'm almost at time, so let me briefly address the choice of law issue. The district court properly determined that Mexico has a superior interest in having its law applied. The plaintiffs were located in Mexico. The purported joint venture agreements that were allegedly breached have no connection to New York of any kind. The foreclosure proceedings were in Mexico. The vessels were in Mexico. The harm would have been felt in Mexico. Plaintiffs point repeatedly- But this was a conduct regulating rule, the tortious interference with contract. Yes.  Well, as to the Amera defendants, they argue that most of the conduct is that certain emails were sent from the Amera defendants in New York. But that doesn't change the fact that Umami and WBC, for example, were not based in New York, were allegedly conspired with Amera. And in our brief, Your Honor, we cite to several cases that post-date Leachy that have found that in instances such as this, where the last act to have occurred takes place is also relevant. And here we would submit that that would be Mexico because that's where the injury was as well. One final point. The connection to New York is sparse as best. Plaintiffs repeatedly point to the WBC and Marner credit agreement to try to say that this is absolutely about New York because that agreement was governed by New York. But it is an important distinction that that is not the agreement that they allege to have been tortiously interfered with. So we submit that that's irrelevant for purposes of the choice of law analysis before the court. Unless there's any other questions. Thank you. It's me again. Before I get into my argument, I just want to address the standing issue. I think you're right. There are serious problems as to which contract was interfered with. But because we were dealing with a motion to dismiss and then subsequently a reorganization, a motion on reconsideration, none of the records, the documents regarding that ever got in the record. And you can't use what happened at the trial. I disagree with their interpretation of what happened. But none of that stuff is in the record because of the procedural posture how the case came up. So let me go back to Mr. Coon's remarks. They rely, he started off by talking about footnote eight in the judge's post-trial opinion. We think it's so clear that that just was dicta. It was a contract case. It went to trial on a contract case. That's what was litigated. Nobody talked about tortious interference. And the judge said something that was just not essential to her ruling. And we don't think it can be used for any purpose on a motion as to whether the district judge got a motion to dismiss and a motion consideration right. You can't use something that happened afterwards. And this case is about on the pleadings that were before the judge, did she get those rulings right? And it has to be decided on the pleadings, not on anything that occurred at the trial or thereafter. It's just improper to raise those issues. Plaintiffs attempt to shoehorn the case into being a New York case by pointing to a whole bunch of emails and stuff like that. But to understand why the district court's rulings were correct, you need to look at the pleadings, both the initial complaint and the amended complaint, particularly the initial complaint. Now, what's interesting is plaintiffs actually go so far, they try to run away from their allegations in the initial complaint. That was what was before the judge when she dismissed it, dismissed the tortious interference claim. They even go so far in their reply brief to say, oh, we're not appealing from that. Yet if you look at both what they say in the brief and their notices of appeal, they are in fact appealing from her rulings. So now you've got to go back, looking at the initial complaint, was she correct? The complaint establishes this is a Mexico-centric case. The guts of plaintiffs' claims in the initial complaint was that Umami was required by the mortgages to give Marner a payoff number, allow it to pay its total obligation so they could get their vessels back. All of that arises from the mortgages, which I've already said arises under Mexican law, and to secure collateral located in Mexico. And as for Umami, the complaint alleges that it was behind the foreclosure proceeding, it frustrated, it didn't deal with Marner's Mexican counsel in Mexico. All of those things occurred in Mexico and not in New York. Did you ever file a motion to dismiss for forum nonconvenience? No. Unfortunately, the judge said that, and she said that might have been an appropriate thing. Counsel at the time were all focused on the complaint doesn't state a claim, and the judge said it's too late now to make it after she kept the contract claim in. Perhaps we would have done it differently, but we thought we would dismiss the contract claim too. But the damages are all in Mexico, as has been said, and that's why the judge properly held on the complaint that was before her that Mexican law applied. I adopt Ms. Colón's, Baselette's arguments regarding choice of laws and why Mexican law doesn't do it. I'll just say in Lychee, I think you're perfectly right, everything took place in the forum. Here, if you look at the complaint and what they allege, most everything took place in Mexico, and that separates it out. So what I want to do now is talk about New York law, because even if you consider the New York law, the district court in the first complaint dismissed the complaint, the tortious interference claim, and said even if New York law applied, it's duplicative of the contract claim and doesn't sufficiently show that there was no justification. And even though they appealed it, look at their briefs. There's nothing. They've waived any argument. They never argue that that ruling was not correct, and it's correct. That's the law of this case. And the same thing is even if you look in the amended complaint, they seem to have done a lawyer's trick. Well, we used to have one count they filed jointly. Now we'll have three counts, and look, it's no longer duplicative. Of course it's duplicative, because what you have to do is look at the conduct that they allege. In the amended complaint, the very same conduct they still allege against Umami is the same conduct that Morner alleges in that very document constitutes a breach of contract. So they can package it any way they want, but the conduct alleged by Umami is exactly the same as the breach of contract. You failed to give us a payoff number. You failed to take money. You failed to do all those things. It's the same contract. It's still duplicative of the breach of contract case. And other than conclusory allegations, they still haven't dealt with the issue that Umami's conduct was justified under the economic justification law in New York law. So this is a Mexican-centric case. Just one thing I skipped over, if you look at the allegations of the amended complaint as to where did the conduct take place, it's still, we've cited, you know, we have a whole long thing in our brief that says, this is the allegations of the amended complaint. It still makes it Mexican-centric. And if you go back over, the judge was right to dismiss the complaint originally, and she was right on her motion for reconsideration, and we ask that you affirm both of those rulings. Thank you very much. Once more for me, Your Honor. Honors. So we did notice an appeal of the original ruling, but not because we were standing behind that complaint, but because we were attacking the Mexican law, the foreign law choice of law ruling. When we filed that complaint, we had not had document discovery. We did not know that as of April 2013, Amera had full control over whether or not Umami would take the money. We pleaded but for causation. We pleaded it in spades. There is no question that we pleaded it, and we didn't have to argue it on our appeal because the court didn't throw us out of, didn't deny reconsideration for failure to plead the elements. She said it's Mexican law, and Mexican law does not recognize a tortious interference claim. So that's what we argued on appeal, and when they raised the other issues, we argued it back on our reply. They argued effectively alternative grounds for affirmance. We did not waive anything. We did not know that in September of 2013, Mr. Tashtian of Amera wrote to one of the other stakeholders that had control over whether or not to take the debt. Servax will ask me, at what price will the vessels be released? Are we prepared to release for $14 million? We should decide on a number, if there is a number, and that's SA-222. Your adversary characterizes the conduct in New York as a few emails, basically, and insufficient to give rise to a New York interest in choice of law. What's your response? I have a one-word response, which is de passage, and I have a longer response, which is the allegations of our complaint plead a course of conduct involving many meetings, hundreds if not thousands of emails emanating from New York, and again, that they made their contractual relationship with Umami, pursuant to which they controlled whether or not they would permit Servax to pay off the debt, subject to New York law. It is all New York law, and again, my one-word response is de passage. You don't have to apply the same law to every party or to every issue. And to say, we're not, by the way, not just talking about a breach in November. This was a continuing series of interference actions, not just with not allowing us to pay off the debt, but again, the black ops that they bragged about, that we didn't know about until we got document discovery, and we were able to plead in the amended complaint that Umami, conspiring with the mayor and Mr. Tashian, were in fact making efforts to prevent us from renting replacement purse seiners and interfering with existing contracts. And that's alleged in the complaint, the proposed amended complaint, and the proposed amended complaint is this thick. It's two volumes of our supplemental appendix because we attach dozens and dozens of incriminating e-mails, and we urge that they be reviewed in considering whether or not we should be allowed to pursue our tortious interference claims. Thank you, Your Honors. Thank you all. Very nicely done. Thanks for organizing the argument to make it maximum comprehensible. Nicely argued. That's the last case on the calendar this morning, so I'll ask the clerk to adjourn court. Court is adjourned.